**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

SYLVIA KERSHAW,                    )
                                   )
                    Plaintiff,     )
                                   )
          v.                       )          1:15CV00753
                                   )
CAROLYN W. COLVIN,                 )
Acting Commissioner of Social      )
Security,                          )
                                   )
                    Defendant.     )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Sylvia Kershaw, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 8 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 12, 14; see also Docket Entry 13 (Plaintiff's Memorandum), Docket Entry 15 (Defendant's Memorandum)). For the reasons that follow, the Court should enter judgment for Defendant.

## I. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI, alleging an onset date of December 29, 2011. (Tr. 199-211.) Upon denial of those applications initially (Tr. 76-95, 122-27) and on reconsideration

(Tr. 96-121, 130-38), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 139-44). Plaintiff (represented by counsel), Plaintiff's sister, Faye McGilvary, and a vocational expert ("VE") testified at the hearing. (Tr. 36-74.) The ALJ subsequently ruled that Plaintiff qualified as disabled under the Act from her alleged onset date of December 29, 2011, through April 1, 2013, but that, beginning on April 2, 2013, Plaintiff's condition medically improved such that she no longer qualified as disabled. (Tr. 14-31.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-6, 12-13, 278-81), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

1.    [Plaintiff] meets the insured status requirements of the [] Act through March 31, 2013.

2.    [Plaintiff] has not engaged in substantial gainful activity since December 29, 2011, the date [Plaintiff] became disabled.

. . .

3.    From December 29, 2011 through April 1, 2013, the period during which [Plaintiff] was under a disability, [Plaintiff] had the following severe impairments: effects of cerebral vascular accidents (CVAs) times two; hypertension; and diabetes.

. . .

4.    From December 29, 2011 through April 1, 2013, [Plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of

2

an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5.  . . . [F]rom December 29, 2011 through April 1, 2013, [Plaintiff] had the residual functional capacity to perform light work . . ., except that she could never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, and climb ramps and stairs. [Plaintiff] could occasionally push and/or pull with the left upper and lower extremities; and occasionally reach with the left upper extremity. She need[s] to avoid concentrated exposure to hazards, such as dangerous machinery and unprotected heights. [Plaintiff] required hourly work breaks to the extent she would be off task greater than 15 percent of the workday.

. . .

6.  From December 29, 2011 through April 1, 2013, [Plaintiff] was unable to perform any past relevant work.

. . .

10.  From December 29, 2011 through April 1, 2013, considering [Plaintiff's] age, education, work experience, and residual functional capacity, there were no jobs that existed in significant numbers in the national economy that [Plaintiff] could have performed.

. . .

11.  [Plaintiff] was under a disability, as defined by the [] Act, from December 29, 2011 through April 1, 2013.

12.  [Plaintiff] has not developed any new impairment or impairments since April 2, 2013, the date [Plaintiff's] disability ended.  Thus, [Plaintiff's] current severe impairments are the same as that present from December 29, 2011 through April 1, 2013.

13.  Beginning April 2, 2013, [Plaintiff] has not had an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

14. Medical improvement occurred as of April 2, 2013, the date [Plaintiff's] disability ended.

. . .

15. The medical improvement that has occurred is related to the ability to work because there has been an increase in [Plaintiff's] residual functional capacity.

. . .

16. . . . [B]eginning April 2, 2013, [Plaintiff] has had the residual functional capacity to perform light work . . ., except she requires a sit/stand option at 60-minute intervals. [Plaintiff] can occasionally climb ladders, ropes, and scaffolds; frequently climb ramps and stairs; and frequently balance and stoop. She can frequently push and/or pull with the left upper and lower extremities; occasionally reach overhead with the left upper extremity, and frequently reach in other directions with the left upper extremity. [Plaintiff] must avoid concentrated exposure to hazards, such as dangerous moving machinery and unprotected heights.

. . .

17. [Plaintiff] is still unable to perform past relevant work.

. . .

20. Beginning April 2, 2012, considering [Plaintiff's] age, education, work experience, and residual functional capacity, there have been jobs that exist in significant numbers in the national economy that [Plaintiff] can perform.

. . .

21. [Plaintiff's] disability ended April 2, 2013.

(Tr. 22-30 (bold font and internal parenthetical citations omitted).)

4

## II.  DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits."  <u>Hines v. Barnhart</u>, 453 F.3d 559, 561 (4th Cir. 2006).  However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited."  <u>Frady v. Harris</u>, 646 F.2d 143, 144 (4th Cir. 1981).  Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A.  Standard of Review

"[C]ourts are not to try [a Social Security] case de novo."  <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).  Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard."  <u>Hines</u>, 453 F.3d at 561 (internal brackets and quotation marks omitted).  "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1992) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)).  "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted).  "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there

is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id.

(quoting 42 U.S.C. § 423(d)(1)(A)).[1] "To regularize the adjudicative process, the Social Security Administration has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[2] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is

---

[1] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. [SSI] . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

[2] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

7

engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

experience) to adjust to a new job." <u>Hall</u>, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. <u>Hines</u>, 453 F.3d at 567.[4]

## B. Assignments of Error

Plaintiff contends that the Court should overturn the ALJ's finding of no disability on these grounds:

(1) "[s]ubstantial evidence of record does not support the ALJ's finding that [Plaintiff] experienced medical improvement" (Docket Entry 13 at 5); and

(2) "[t]he ALJ erred in failing to grant [Plaintiff's] request for a post-hearing psychological consultative evaluation to assess her cognitive deficits" (<u>id.</u> at 10).

Defendant disputes Plaintiff's assignments of error, and urges that substantial evidence supports the finding of no disability. (<u>See</u> Docket Entry 15 at 6-20.)

### 1. Medical Improvement

In Plaintiff's first assignment of error, she contends that the ALJ failed to support his finding of medical improvement as of

---

[4] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. <u>See, e.g.</u>, <u>Hunter</u>, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

April 2, 2013, with substantial evidence. (See Docket Entry 13 at 5-9.)[5]    In particular, Plaintiff asserts that the ALJ "misinterpreted" an April 2, 2013 statement Plaintiff made to a consulting neurologist during a hospitalization that she felt back to "her baseline" (id. at 6 (internal quotation marks omitted) (citing Tr. 500)), by concluding that Plaintiff's "baseline" statement contradicted her testimony that neurological deficits had continued beyond April 2, 2013 (id. (citing Tr. 28)).    Plaintiff emphasizes that, according to her family, Plaintiff's presentation during that hospitalization, including observations by treatment providers that Plaintiff "was a poor historian and seemed slightly slow and forgetful," actually represented "her baseline since 2011." (Id. at 7; see also Tr. 507, 508.)    Moreover, Plaintiff maintains that the ALJ "fail[ed] to consider the parts of the record that suggest that [Plaintiff] [wa]s not 'back at baseline' after April 2, 2013" (Docket Entry 13 at 8), including improperly discounting the opinions of Plaintiff's treating physician, Dr. Martina Dockery-Monroe (id.; see also Tr. 297, 575-79), and failing to weigh the testimony of Plaintiff's sister, Ms. McGilvary (id. at 8-9 (citing Tr. 64-67)).    Plaintiff's arguments fall short.

The regulations define "medical improvement" as "any decrease in the medical severity of [a claimant's] impairment(s) which was

_____

[5] Neither party challenges the ALJ's conclusion that Plaintiff qualified as disabled under the Act from December 29, 2011 to April 1, 2013. (See Docket Entry 13 at 6-20; Docket Entry 15 at 5-12.)

present at the time of the most recent favorable medical decision that [the claimant was] disabled . . . ." 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1). The ALJ must base a finding of medical improvement "on changes (improvement) in the symptoms, signs, and/or laboratory findings associated with [the claimant's] impairment(s)." Id. If the ALJ finds medical improvement, he must then determine whether that improvement resulted in an increased RFC to perform work activities. See 20 C.F.R. §§ 404.1594(a), (b)(2)-(4), (c)(2), (f)(4); 20 C.F.R. §§ 416.994(a), (b)(2)-(4), (c)(2), (f)(4).

Here, the ALJ supported his finding of medical improvement with substantial evidence. Although the ALJ noted Plaintiff's April 2, 2013 "baseline" statement (Tr. 28), the ALJ's subsequent explanation makes clear he did not misinterpret that statement. In regards to medical improvement, the ALJ stated as follows:

> On [April 2, 2013], [Plaintiff] indicated that she felt back at her baseline. She was not aware of any increased weakness on the left and had no more changes. As discussed above, <u>functioning began to improve in August 2012</u>, despite continued smoking and some noncompliance with medication. [Plaintiff] [had] decreased strength at 4/5 in August 2012 and slow speech, but her tremors had improved. <u>From a visit later in August 2012 to January 2013, her gait, sensation, coordination, and muscle strength were normal</u>. On July 11, 2013, [Plaintiff] was doing "quite well" clinically and had only "very mild left hemiparesthesias." <u>Blood pressure readings from June 2012 to January 2013 were within normal range</u>.

(Id. (internal citations omitted) (emphasis added.) As the emphasized portions of the ALJ's analysis show, the ALJ focused on

improvement in Plaintiff's functioning beginning in August 2012, followed by a period of relative stability in Plaintiff's symptoms from late August 2012 to January 2013. (Id.) Moreover, the ALJ did acknowledge that, even by July 2013, Plaintiff still experienced very mild left hemiparesthesias. (Id.) The context thus demonstrates that the ALJ did not misinterpret Plaintiff's "baseline" statement or construe it to mean Plaintiff had reached a symptom-free state of full functionality; rather, the ALJ viewed Plaintiff's "baseline" as the point at which Plaintiff's post-stroke deficits had improved and stabilized. (See Tr. 29 (noting that, after April 2013 hospitalization, "[s]ubsequent treatment records documented stability in functioning".)[6]

Plaintiff further faults the ALJ for affording little weight to Dr. Monroe's January 9, 2014 opinions, which Plaintiff maintains show that she did not return to her baseline after April 2, 2013. (See Docket Entry 13 at 8; see also Tr. 29, 575-79.) According to Plaintiff, "the record shows that [Plaintiff] continued to have episodes of 'shaking of the arm and leg' lasting for 'several minutes'" (Docket Entry 13 at 8 (quoting Tr. 559)) and "continued to struggle with . . . depression and memory deficiencies" (id.

---

[6] Notably, the ALJ did not, as Plaintiff argues (see Docket Entry 13 at 6), remark that Plaintiff's "baseline" statement contradicted her testimony that any neurological deficits continued after April 2, 2013; rather, he found that the "baseline" statement contradicted Plaintiff's testimony that the "same neurological deficits" that Plaintiff experienced in the aftermath of her December 2011 stroke persisted beyond April 2, 2013, (Tr. 28 (emphasis added)).

(citing Tr. 493, 498, 507-10, 548, 571, 584, 589) (internal citation omitted)).[7]

The treating source rule generally requires an ALJ to give controlling weight to the opinion of a treating source regarding the nature and severity of a claimant's impairment. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("[T]reating sources . . . provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."). The rule also recognizes, however, that not all treating sources or treating source opinions merit the same deference. The nature and extent of each treatment relationship appreciably tempers the weight an ALJ affords an opinion. See 20 C.F.R. §§ 404.1527(c)(2)(ii), 416.927(c)(2)(ii). Moreover, as subsections (2) through (4) of the rule describe in great detail, a treating source's opinion, like all medical opinions, deserves deference only if well-supported by medical signs and laboratory findings and consistent with the other substantial evidence in the case record. See 20 C.F.R. §§ 404.1527(c)(2)-(4), 416.927(c)(2)-(4). "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded

---

[7] Plaintiff's citation to pages 584 and 589 of the administrative transcript constitutes a typographical error, as the transcript ends with page 579.

significantly less weight." Craig, 76 F.3d at 590 (emphasis added).

Dr. Monroe completed a "Stroke [RFC] Questionnaire" on January 9, 2014, and opined that, as a result of Plaintiff's stroke(s), she could sit and stand each for no more than 10 minutes at a time and for less than two hours total in a workday, walk less then one quarter of a block and less than two hours total in a workday, would require 15 to 20 minute breaks every 20 minutes, would need to elevate her legs for one to two hours per workday, could never lift or carry objects weighing less than 10 pounds or engage in any postural movements, could handle, finger, and reach less than five percent of the workday, and must avoid all exposure to environmental conditions. (See Tr. 576-78.) According to Dr. Monroe, Plaintiff's symptoms "[c]onstantly" interfered "with attention and concentration needed to perform even simple work tasks" (Tr. 576), and would cause her to be absent from work more than four times per month (Tr. 579).

The ALJ summarized Dr. Monroe's opinions, and then provided the following analysis:

> [T]he evidence beginning on April 2, 2013, documented that [Plaintiff's] clinical findings were no worse than mild. This opinion is grossly exaggerated and is not supported by the medical record, including Dr. Monroe's own treatment notes. Accordingly, the [ALJ] gives this opinion little weight for the period beginning on April 2, 2013.

14

(Tr. 29.)  Thus, the ALJ complied with the regulations, and discounted Dr. Monroe's opinions both as not "well-supported by medical signs and laboratory findings" in Dr. Monroe's treatment records <u>and</u> as inconsistent "with the other substantial evidence in the case record," 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  (<u>See</u> Tr. 29.)

A review of the relevant portions of the record confirms the ALJ's above-described conclusions.  The record contains only two treatment records from Dr. Monroe between April 2, 2013, the date the ALJ found Plaintiff's disability ended, and January 9, 2014, the date on which Dr. Monroe offered her opinions.  (<u>See</u> Tr. 548-50, 571-74.)  On April 24, 2013, Plaintiff presented to Dr. Monroe with primary complaints of urinary tract infection, rash, and depression.  (<u>See</u> Tr. 548.)  Dr. Monroe described Plaintiff as "[a]lert and oriented," noted a blood pressure of 95/61, and documented a physical examination with no significant findings. (Tr. 549.)  Nearly eight months later, Plaintiff sought treatment with Dr. Monroe to refill her prescriptions and for complaints of constipation and a "[d]ark spot" on her right leg.  (Tr. 571.)  Dr. Monroe recorded a blood pressure of 126/86, and found Plaintiff "[a]lert and oriented" with [n]o focal [neurological] deficits" and a "[n]ormal range of motion."  (Tr. 573.)  These relatively benign findings do not support the extreme limitations that Dr. Monroe offered on January 9, 2014.  (<u>See</u> Tr. 575-79.)

The record contains only one other treatment record between April 2, 2013, and January 9, 2014 – a July 11, 2013 visit with treating neurologist Dr. Bruce S. Solomon. (See Tr. 559-60.) Plaintiff faults the ALJ for "fail[ing] to consider" Plaintiff's complaint to Dr. Solomon of episodic "shaking of the arm and leg" that "last[ed] for several minutes" and Dr. Solomon's concern that those shaking episodes could constitute "focal motor seizures." (Docket Entry 13 at 8; see also Tr. 559.) However, the ALJ expressly noted Plaintiff's testimony that "her left hand and left leg shook twice weekly" and "that th[o]se episodes lasted about [five] to 10 minutes and had gotten worse" (Tr. 24; see also Tr. 45), and found her statements "generally credible from December 29, 2011 through April 1, 2013" (Tr. 24), but "not entirely credible" for the period beginning on April 2, 2013 (Tr. 29).[8] Moreover, the mere possibility that Plaintiff's shaking episodes could represent focal motor seizures does not mandate acceptance of Dr. Monroe's extreme limitations, especially where, as here, Dr. Solomon noted that Plaintiff's electroencephalogram ("EEG") showed no abnormalities, he did not witness any of Plaintiff's episodes, the episodes did not cause Plaintiff any pain, and Dr. Solomon concluded that Plaintiff "[wa]s doing quite well clinically." (Tr. 560.)

---

[8] Plaintiff has not challenged the ALJ's analysis of Plaintiff's subjective complaints. (See Docket Entry 13 at 5-12.)

Plaintiff additionally challenges the ALJ's failure to "explain the weight assigned to Ms. McGilvary's opinion and why he found her testimony to be less credible for the period beginning on April 2, 2013." (Docket Entry 13 at 8-9.) Ms. McGilvary testified that Plaintiff suffered from memory loss, that she did not understand or comprehend things well, that she avoided interaction with others, and that she had trouble focusing. (See Tr. 63-67.) The ALJ noted Ms. McGilvary's testimony that Plaintiff "had problems with memory and comprehension" (Tr. 24), but did not expressly state the weight he assigned to Ms. McGilvary's testimony (see Tr. 18-31).

An ALJ may consider evidence from non-medical sources, such as statements from spouses, parents, caregivers, siblings, other relatives, friends, neighbors, and clergy, to determine the severity of a claimant's impairments and his or her residual ability to work. See 20 C.F.R. §§ 404.1513(d)(4), 416.913(d)(4); see also Social Security Ruling 06-03p, Titles II and XVI: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies, 2006 WL 2329939, at *2 (Aug. 9, 2006) ("SSR 06-03p"). "[I]nformation from [non-medical sources] may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's

ability to function[;]" however, in considering evidence from these sources, "it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." SSR 06-03p, 2006 WL 2329939, at *2, *6.

Here, the ALJ failed to expressly indicate the weight he assigned to Ms. McGilvary's testimony (see Tr. 18-31); however, notwithstanding that error, no basis exists for remand of the case. Plaintiff has failed to demonstrate how an express weighing of Ms. McGilvary's testimony would have resulted in a different outcome in the case, see generally Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires [a court] to remand a case in quest of a perfect opinion [by an ALJ] unless there is reason to believe that the remand might lead to a different result"). (See Docket Entry 13 at 8-9.) Ms. McGilvary's testimony regarding Plaintiff's cognitive deficits largely corroborated Plaintiff's testimony (compare Tr. 59-60, with Tr. 63-67), and Plaintiff did not challenge the ALJ's finding that Plaintiff's statements lacked full credibility for the period beginning on April 2, 2013 (see Docket Entry 13 at 5-12). That fact defeats this aspect of Plaintiff's first assignment of error. See Dyrda v. Colvin, 47 F. Supp. 3d 318, 326-27 (M.D.N.C. 2014) (Schroeder, J.) (finding ALJ's failure

18

to properly evaluate lay witness's statement harmless error where "the statement added little of substance to the record because it merely corroborated [the plaintiff's] testimony, which the ALJ expressly found not to be credible in light of the medical evidence and record" and where the plaintiff made "no attempt to show at which step he was prejudiced by the ALJ's failure to explain the weight given to the lay witness's statement").

Thus, Plaintiff's first assignment of error entitles her to no relief.

## 2. Consultative Psychological Evaluation

In Plaintiff's second and final issue on review, she contends that the ALJ erred by failing to grant Plaintiff's request for a post-hearing consultative psychological evaluation to assess her cognitive deficits. (See Docket Entry 13 at 10-12.) Although Plaintiff acknowledges Dr. Solomon's July 11, 2013 findings that Plaintiff displayed "'[n]o impairment of attention, impairment of concentration, impairment of long term memory or impairment of short term memory'" (id. at 10 (quoting Tr. 560)), she maintains that "evidence . . . to the contrary" exists in the record (id. (citing Tr. 22-24, 493, 498, 507-10, 571)).[9] According to

---

[9] Many of Plaintiff's cited transcript pages do not, in fact, supply evidence contradicting Dr. Solomon's July 11, 2013 findings. Pages 22 through 24 of the transcript constitute pages of the ALJ's decision. (See Tr. 22, 24.) Pages 493 and 498 involve treatment in 2012, during the period in which the ALJ found that Plaintiff qualified as disabled. (See Tr. 493, 498.) Page 571 merely reflects Plaintiff's subjective complaints of "[c]onfusion, [l]oss of coordination, [m]emory loss, [and] decreased concentration" (Tr. 571), and the remainder of that examination on December 10, 2013, contains no objective findings of any
(continued...)

19

Plaintiff, "there are inconsistencies in the record regarding whether or not [Plaintiff] suffers from ongoing memory impairment" (id. at 12), which triggered the ALJ's duty to order a consultative examination (id. at 11 (citing 20 C.F.R. § 404.1519a)). Plaintiff's contention fails to warrant relief.

An ALJ has discretion in deciding whether to order a consultative examination. See 20 C.F.R. §§ 404.1519a, 416.919a; Bishop v. Barnhart, 78 F. App'x 265, 268 (4th Cir. 2003). The ALJ may order a consultative examination "to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow [the ALJ] to make a determination or decision on [the] claim," 20 C.F.R. §§ 404.1519a(b), 416.919a(b).

The ALJ did not abuse his discretion by denying Plaintiff's request for a consultative evaluation. (See Tr. 18 (denying request and finding that "the medical evidence of record after the closed period [of disability from December 29, 2011 to April 1, 2013] shows little to no memory impairment or cognitive deficit").) As an initial matter, the ALJ did not find the evidence before him inadequate (see Tr. 18-31), and Plaintiff makes no argument to the contrary (see Docket Entry 13 at 5-12).[10] Rather, Plaintiff relies

---

[9] (...continued)
cognitive deficits (see Tr. 571-74).

[10] Indeed, the ALJ had before him records of office visits with Plaintiff's treating neurologist spanning from December 31, 2011, to July 11, 2013 (see Tr. 326-27, 330-32, 402-04, 493-99, 559-60), as well as records from multiple hospitalizations for stroke symptoms and diagnostic tests, such as MRIs, CT scans, and EEGs (see Tr. 328, 329, 396-400, 423-25, 448, 453-54, 469-70, 471-72, (continued...)

on "inconsistencies" in the evidence regarding the degree of Plaintiff's cognitive impairment as the basis of the ALJ's duty to order the consultative evaluation. (See id. at 12.) However, the ALJ bears the duty to resolve conflicts in the evidence, see Craig, 76 F.3d at 589 (noting that, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]"), and the ALJ here resolved any inconsistencies in the evidence regarding Plaintiff's cognitive deficits, and did not indicate that he required any further information to reach his conclusions (see Tr. 18-31).

Under such circumstances, the ALJ did not abuse his discretion by denying Plaintiff's request for a consultative evaluation. See Cosom v. Astrue, No. 11-CV-294, 2012 WL 1898921, at *7 (W.D.N.C. Feb. 23, 2012) (unpublished) (finding "there was no need to arrange for a consultative examination because the ALJ had all the information he needed to reach a decision").

### III. CONCLUSION

Plaintiff has not established an error warranting reversal or remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for

---

[10] (...continued)
500, 502-09, 537-38, 539-40).

Judgment on the Pleadings (Docket Entry 12) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 14) be granted, and that judgment be entered for Defendant.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

October 13, 2016